UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAURENCE F. DOUD III,

Plaintiff,

-v.-

ROCHESTER DRUG CO-OPERATIVE, INC.; JOSEPH BRENNAN; JOHN KINNEY

Defendants.

Docket No.

**COMPLAINT AND JURY DEMAND**

Plaintiff Laurence F. Doud III ("Mr. Doud" or "Plaintiff"), by and through his undersigned counsel, Gottlieb & Janey LLP, as for his complaint against Defendants Rochester Drug Co-Operative Inc., Joseph Brennan and John Kinney (collectively, "Defendants") alleges as follows:

## NATURE OF THE ACTION

1. This is an action for damages arising out of the Defendants' defamation, tortious interference and wrongful termination of Mr. Doud. After serving as the Chief Executive Officer ("CEO") of Rochester Drug Co-Operative Inc. ("RDC" or the "Company") for more than two and a half decades, the Defendants have engaged in a calculated campaign against Mr. Doud to tarnish his professional reputation and ultimately shift onto him the blame for a mounting federal criminal investigation into RDC. The Defendants have accomplished this effort, at least in part, by making statements to RDC customers, shareholders, and employees in which they have stated *inter alia*, in sum and substance, that Mr. Doud had an illicit financial arrangement with certain RDC customers; ignored requisite regulatory requirements in order to boost sales activity with certain RDC customers to, in turn, enhance his compensation or to otherwise receive illicit monies from these particular companies; and embroiled RDC in a criminal investigation as a

result of *his* wrongful and criminal conduct. These statements are false and knowingly false when made.

2. Starting in September 2017, the Defendants have systematically attacked Mr. Doud's professional competence, accused him of criminal activity, debilitated his participation at RDC, and eventually terminated Mr. Doud's employment at RDC without cause. On information and belief, this was done by the Defendants in an effort to shield the current RDC CEO, Joseph Brennan, from an active federal criminal investigation into the Company.

3. In an effort to make Mr. Doud the proverbial "scapegoat," Joseph Brennan and John Kinney have falsely portrayed to the RDC board of directors and clients that Mr. Doud <u>intentionally</u> caused RDC to under-report its drugs sales to regulators, especially in respect of pain management-related drug sales. These statements are false and were knowingly false when made.

**<u>PARTIES</u>**

4. Plaintiff Mr. Doud is a natural person who at all relevant times was over the age of 18, and resides in New Smyrna Beach, Florida. Mr. Doud is the most recent former CEO of RDC. Mr. Doud was the CEO of RDC for more than twenty-five years.

5. Defendant RDC is regional wholesale drug co-operative and a private corporation organized under the laws of the State of New York with its principal place of business located at 50 Jet View Drive, Rochester, New York 14624-0389. RDC distributes retail prescription medications to independent pharmacies, as well as ambulatory aids, wound care products, incontinence products, bathroom safety equipment, urologicals, orthopedic soft goods, sickroom supplies, respiratory products, diabetes and other diagnostic products, over-the-counter medications and health and beauty aids, and daily living comfort aids to home health care dealers. Ranked as the 7th largest wholesaler in the United States, RDC services over 1,300

northeastern community retail pharmacies, long-term care pharmacies, and home health care stores in 10 states. As a co-operative, many of the RDC clients are stockholders and receive patronage dividends based on their patronage of RDC. Dividends have been issued unfailingly since 1987.

6. Defendant Joseph Brennan ("Brennan") is a natural person who, at all relevant times, was over the age of 18, and, upon information and belief, resides in the State of New York. Brennan is the current CEO of RDC.

7. Defendant John Kinney ("Kinney") is a natural person, who, at all relevant times, was over the age of 18, and, upon information and belief, resides in the State of New York. Kinney is the Chief Financial Officer of RDC.

**RELEVANT NON-PARTIES**

8. Linden Care, LLC ("Linden Care") is a retail and specialty pharmacy focused on pain management. Linden Care is headquartered in Syosset, New York. Linden Care is owned by BelHealth Investment Partners. Linden Care's relationship with RDC is an area of focus in the Department of Justice's (the "DOJ") ongoing criminal investigation into RDC.

9. BelHealth Investment Partners ("BelHealth") is a private equity firm focused on lower middle market healthcare companies. BelHealth is based in New York. On or about July 2, 2013, BelHealth acquired a majority share of Linden Care. Brennan and Kinney have both made defamatory statements that Mr. Doud had an improper financial arrangement with BelHealth at the expense of RDC.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over the wrongful termination, defamation and tortious interference causes of action, pursuant to 28 U.S.C. § 1332 (diversity).

11. The amount of damages at issue exceeds $75,000.00, exclusive of interest and

costs.

12. This Court has personal jurisdiction over each of the Defendants because they reside in New York State, at all relevant times transacted business in New York State, and continue to do so.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), (d). All of the Defendants reside in New York State. RDC maintains contacts in the Southern District of New York that would be sufficient to subject it to personal jurisdiction in this district if it were a separate State as it regularly conducts business in this district.

## FACTS

Overview

14. During Mr. Doud's auspicious tenure as CEO of RDC, he transformed the Company into a household name within the independent pharmacy industry and spearheaded tremendous growth. Between 1991 and 2017, Mr. Doud's sales strategies resulted in RDC's revenue swelling from sixteen million dollars to over two billion dollars; RDC's workforce quadrupling from forty employees to over two hundred; and the Company growing from a small boutique operation into the seventh largest wholesaler in the United States.

15. As Mr. Doud neared retirement, and as part of the Company's leadership transition plan, Mr. Doud entered into a new written employment agreement with RDC for a term of five years commencing on April 1, 2014 and terminating on March 31, 2019. On April 1, 2017, in accordance with this employment agreement, Mr. Doud received *emeritus* status at RDC and stepped down as CEO, becoming a consultant to the board of directors for his last two years of contractual employment. Brennan then became RDC's new CEO.

16. Since 2013, the DEA and DOJ had been investigating RDC for certain failures to properly report its sales of drugs to pharmacies in the New York area, including Linden Care.

This investigation resulted in the DOJ commencing a civil complaint on or about July 6, 2015 against RDC for violations of the Controlled Substances Act (the "Controlled Substances Act" or the "CSA"). On or about July 8, 2015, RDC entered into a settlement agreement with the DOJ.

17. Over the past year, a subsequent criminal investigation into RDC has intensified and placed a cloud over the Company. In an effort to blame Mr. Doud, Brennan and Kinney methodically initiated a campaign to defame Mr. Doud, barred him from attending RDC board of directors meetings, and ultimately terminated Mr. Doud from RDC without cause. In both the defamatory statements and the termination notice, the Defendants falsely claimed that Mr. Doud had an illicit relationship with BelHealth, the owner of Linden Care, which purportedly enabled Mr. Doud to reap financial benefits at the expense of the Company. Brennan and Kinney further falsely asserted that Mr. Doud's "side deal" with BelHealth was the source of RDC's violations of the CSA, the DOJ civil action, and the ongoing criminal investigation into the Company.

Mr. Doud's Background and Tenure at RDC

18. Prior to joining RDC, Mr. Doud accumulated over twenty two years of sales experience within the independent pharmacy industry.

19. From 1965 until 1976, Mr. Doud rapidly rose through the ranks of McKesson, one of the largest pharmaceutical distributors in the world. During his time there, Mr. Doud advanced from order-filler, to sales trainee, and ultimately to sales manager.

20. From 1976 until 1987, Mr. Doud worked at Cardinal Health, a Fortune 500 healthcare services company, as a sales manager for retail pharmacy, and eventually rose to the position of Senior Vice President of sales.

21. In 1987, Mr. Doud joined RDC as a sales manager and immediately had a tremendous impact at the Company.

22. On or about September 1991, Mr. Doud was appointed CEO of RDC. Mr. Doud

wasted no time in transforming the Company. He immediately hired additional sales representatives and opened new markets in Buffalo, Syracuse and the Southern Tier of New York State.

23. Over the next two and a half decades as CEO of RDC, Mr. Doud expanded the RDC distribution network to seven states and more than 1,300 independently owned community retail pharmacies; opened a second distribution center; and moved the Company to its current headquarters in Rochester, New York.

24. Mr. Doud also received several prestigious awards in recognition of his impact on the independent pharmacy industry, including, in July 2017, the Pharmacists Society of the State of New York Lifetime Achievement Award; a Doctor of Humane Letters from the Albany College of Pharmacy and Health Sciences in May 2016[1]; the Mortar and Pestle Award from Pennsylvania Pharmacists Association ("PPA")[2]; and induction into the Rochester Pharmacy Champions Wall of Fame in 2013.

25. On March 11, 2014, as part of a leadership transition plan, Mr. Doud entered into a new written employment agreement (the "Employment Agreement") with RDC for a term of five years commencing on April 1, 2014 and terminating on March 31, 2019. (Attached hereto as Exhibit A.) This contract was substantially similar in nature to those Mr. Doud had operated under with RDC since 1993.

26. Under the Employment Agreement, Mr. Doud would serve as CEO of RDC for the first three years of the term—through April 1, 2017. During the fourth and fifth years of the Employment Agreement, Mr. Doud would step down as CEO, continue to attend all board of directors meetings and advise the newly appointed CEO of RDC. (*See* Exhibit A.)

---

1 An honorary degree given to those who have distinguished themselves in areas other than science, government, literature or religion.

2 An award presented solely at the discretion of the PPA Board of Directors which recognizes exemplary service to the pharmacy profession.

27. During the fourth and fifth years of the Employment Agreement, Mr. Doud would earn an annual base compensation of $500,000. (*See* Exhibit A.) Additionally, above and beyond his annual base compensation, Mr. Doud, under the terms of the Employment Agreement, had an opportunity to earn additional income through special projects.

28. The Employment Agreement also provided Mr. Doud, after March 31, 2019, with ten years of family health insurance coverage and full supplemental coverage with drug coverage plus out-of-network benefits. (*See* Exhibit A.) Furthermore, Mr. Doud had full use of a company-paid automobile as well as reimbursement by RDC of any and all expenses related to the automobile.

29. On or about April 1, 2017, as anticipated by the Employment Agreement, Mr. Doud stepped down as CEO of RDC. At that time, Brennan was appointed as the new CEO of RDC.

30. RDC's April 2017 newsletter commemorated Mr. Doud's leadership and proclaimed that "Larry instituted a strategy of aggressive sales growth supported by a solid management team and a consuming vision to make RDC the Knight In Shining Armor for Independent Pharmacy… [Mr. Doud's] impression on the corporate culture and numerous employees will never be forgotten." (Attached hereto as Exhibit B, 1.)

31. By RDC's own statement in the April 2017 newsletter, under Mr. Doud's leadership, RDC improved from being one of the lowest ranked independent pharmacy wholesalers to the seventh largest wholesaler in the United States. (*See* Exhibit B.)

32. RDC and its stake-holders (*e.g.*, lawyers) held four separate retirement parties for Mr. Doud, including a gala event in which practically all members of the Company were in attendance, on information and belief.

33. Following his retirement, in accordance with the Employment Agreement, Mr.

Doud continued at RDC to oversee the leadership transition and consult the Company's board of directors.

Investigation into RDC for Non-Compliance with Regulations

34. Since 2013, the DEA and DOJ have been investigating RDC for compliance violations of the CSA. During the relevant time under investigation, Brennan was responsible for RDC's compliance with the Controlled Substances Act. In fact, on information and belief, Brennan strenuously marketed himself for this assignment to RDC's Board of Directors.

35. Pursuant to the CSA, the DEA regularly tracks the commercial distribution of substances with a high potential for abuse through its Automation of Reports and Consolidated Orders System ("ARCOS").

36. Upon information and belief, in early 2013, the DEA visited several pharmacies in New York City that reported the routine electronic purchase of ARCOS Reportable controlled substances from RDC.

37. The DEA discovered that certain pharmacies had reported thousands of purchase orders from RDC but RDC did not correspondingly report to the DEA through ARCOS.

38. In response, on or about July 31, 2013, the DEA conducted an on-site investigation of RDC. The DEA's audit confirmed that RDC's ARCOS reporting was underreporting drug sales to pharmacies throughout the northeast region.

39. Upon information and belief, a substantial portion of these underreported sales was to Linden Care.

40. RDC responded that its failure to electronically report certain ARCOS data was likely due to a computer software problem and that it expected to be able to resolve this problem through the pending acquisition of a new order system.

41. Upon information and belief, Brennan personally assured the DEA that RDC

would presently acquire and implement the new order system and software.

42. However, in June 2014, the DEA reassessed RDC's compliance and discovered that RDC had not implemented its new order system.

43. As a consequence, RDC's failure to report the distribution of thousands of electronic Schedule II and certain Schedule III orders in ARCOS continued.

44. During this time, the DEA also determined that RDC had for years failed to report the theft or significant loss of controlled substances in ARCOS.

45. On or about July 6, 2015, the DOJ brought a civil complaint against RDC for its continued violations of the CSA.

46. On or about July 8, 2015, RDC entered into a settlement agreement with the DOJ (the "Settlement Agreement").

47. In the Settlement Agreement, RDC agreed to pay the DEA $360,000 in fines for these violations and to re-submit corrected record-keeping reports required under the CSA.

48. In the Settlement Agreement, RDC also admitted that between July 2013 and July 2014, it failed to report any electronic distribution transactions to the DEA through ARCOS, and that between July 2012 and July 2014, it failed to include theft and significant loss data in its DEA ARCOS reporting.

49. This concession by RDC was notable as Brennan served as RDC's Chief Operating Officer and managed the Company's compliance department from June 2013 until April 2017. Thus, Brennan was responsible for RDC's compliance during almost all of the relevant time period that RDC failed to comply with the reporting requirements under the CSA.

50. On or about March 8, 2017, the civil branch of the DOJ referred the investigation of RDC's noncompliance with the CSA to its Criminal Division. The DOJ Criminal Division, along with the DEA, subsequently issued a subpoena to RDC requesting documentation

regarding controlled substances; customer due diligence, suspicious order monitoring and reporting; cooperative members and dividends; pricing and sales; and controlled substance customers. The subpoena also requested all communications between RDC and Linden Care.

51. On or about November 1, 2017, the DOJ issued a Grand Jury Subpoena to RDC for documentation similar, but not identical, to the records covered by the subpoena issued to RDC on March 8, 2017.

Defendants Attempt to Use Mr. Doud as a Scapegoat

52. As the DOJ's criminal investigation into RDC intensified and loomed over the Company, Brennan and Kinney commenced a coordinated effort to use Mr. Doud as a scapegoat.

53. On or about September 9, 2017, at an RDC board meeting and in the presence of the Board of Directors, Brennan confronted Mr. Doud and claimed that Mr. Doud was going to prison for his role in the Company's recent violations of the CSA.

54. Brennan further accused Mr. Doud, in sum and substance, of being involved in a "kickback scheme" with BelHealth, the owner of Linden Care, in which Mr. Doud was purportedly directly paid to falsely report Linden Care's sales to RDC. Brennan also asserted, in sum and substance, that Mr. Doud's "side deal" with BelHealth was the true cause of the DOJ civil complaint and ongoing criminal investigation into the Company. These allegations by Brennan were false and knowingly false when made.

55. Any compensation that Mr. Doud received in relation to BelHealth was dictated by and in accordance with Mr. Doud's employment contract with RDC.

56. After Brennan humiliated and defamed Mr. Doud in front of RDC's Board of Directors, Brennan then began to systematically remove Mr. Doud from the Company that he built over the past two and a half decades—all in violation of the Employment Agreement.

57. First, on or about November 27, 2017, RDC constructively terminated Mr.

Doud's employment at the Company. RDC's board of directors informed Mr. Doud in writing that, "effective immediately and until further written notice from RDC," he was to not attend any future board of director meetings. (Attached hereto as Exhibit C.) RDC took this action even though the Employment Agreement unequivocally provides that Mr. Doud's responsibilities include attending Board of Director meetings, and such attendance was part of terms for his service under the Employment Agreement. (*See* Exhibit C, ¶19(A)(1).)

58. In response, on or about January 5, 2018, Mr. Doud's counsel notified RDC's counsel that their November 27th letter to Mr. Doud was a willful violation of the Employment Agreement and implored RDC to resolve the matter in lieu of litigation. (Attached hereto as Exhibit D.)

59. Nevertheless, without any response to counsel's entreaties, following Mr. Doud's constructive termination, the Defendants *continued* to take wrongful actions against Mr. Doud. For example, on or about February 2018, Kinney falsely stated to Don Catalano, the owner of Glen Cove pharmacy—a client—that RDC would not being paying patronage dividends to its members in 2018 **due to Mr. Doud's past failures as CEO of RDC**. Kinney further asserted to Mr. Catalano, and falsely, that Mr. Doud was responsible for RDC's recent legal troubles with the DEA and DOJ. These claims by Mr. Kinney have no basis in fact.

60. On or about March 13, 2018, after defaming Mr. Doud and constructively dismissing him from the Company, RDC ultimately sent Mr. Doud a notice of termination of the Employment Agreement ("Termination Notice"). The Termination Notice stated that RDC was exercising its right to terminate Mr. Doud's Employment Agreement with RDC, for cause, effective April 12, 2018. (Attached hereto as Exhibit E.)

61. The Termination Notice alleged that Mr. Doud's violated the following paragraphs of the Employment Agreement: 9, 7(A), 7(B), 7(D), and 7(E). (*See* Exhibit E.)

Further, RDC made other false and defamatory allegations, including that Mr. Doud failed "to conduct [himself] in an exemplary manner," committed "misconduct," and "[refused] to faithfully and diligently perform the provisions of the Agreement"—without further elaboration. (*See* Exhibit E, 1.)

62. The Termination Notice also falsely alleged that Mr. Doud failed to "[comply] with RDC's policies concerning the sale of narcotics to new customers" and was in "receipt of financial benefit through RDC's relationship with BelHealth at the expense of RDC's other members," without further elaboration. In tandem with the coordinated attack of Mr. Doud, the latter explanation in the Termination Notice contained the same false claims that Brennan and Kinney had asserted against Mr. Doud over the prior months. (*See* Exhibit E, 1.)

63. As of the effective date of the Termination Notice on April 12, 2018, Mr. Doud will be wrongfully deprived of several significant benefits.

64. For example, the fifth year of Mr. Doud's Employment Agreement with RDC <u>begins</u> on April 1, 2018. Under the Employment Agreement, in accordance with Schedule A, Mr. Doud is owed $500,000 in compensation for this fifth year. (*See* Exhibit E.)

65. As a result of Mr. Doud's improper termination by RDC, he will be deprived of $500,000 in compensation, as well as ten years of family health insurance coverage and full supplemental coverage with drug coverage plus out-of-network benefits. Mr. Doud will also be deprived of the benefits under the supplemental retirement plan as well as those afforded by use of the company automobile. (*See* Exhibit A.)

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Wrongful Termination - Breach of Employment Contract

### *Against RDC*

66. Plaintiff repeats and re-alleges paragraphs 1 - 65 as if set forth at length herein.

67. Under New York law, the elements of a breach of contract claim are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. *E.g., RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 Fed. Appx. 349, 350–51 (2d Cir. 2005) (citation omitted).

68. On March 11, 2014, Mr. Doud entered into the Employment Agreement with RDC for a term of five years commencing on April 1, 2014 and terminating on March 31, 2019.

69. Mr. Doud fully performed his duties under the Employment Agreement and performed all preconditions to performance by the other contracting party, RDC.

70. RDC breached the Employment Agreement by wrongfully terminating Mr. Doud's employment before the contract's expiration.

71. Mr. Doud was terminated by RDC without cause.

72. Contrary to the Termination Notice, Mr. Doud did not violate Paragraphs 9, 7(A), 7(B), 7(D), and 7(E) of the Employment Agreement.

73. Mr. Doud did not fail to comply with RDC's policies concerning the sale of narcotics to new customers.

74. Mr. Doud was not in receipt of any financial benefits through RDC's relationship with BelHealth at the expense of RDC's other members. Mr. Doud was never involved in a "kickback scheme" with BelHealth. Any compensation that Mr. Doud received in relation to BelHealth was dictated by Mr. Doud's employment contract with RDC.

75. As a result of this breach of contract by RDC, Mr. Doud has been damaged in an amount to be determined at trial but not less than $2,000,000 together with other costs, interest and attorneys' fees.

## SECOND CAUSE OF ACTION

### Defamation- Slander

### *Against All Defendants*

76. Plaintiff repeats and re-alleges paragraphs 1 - 75 as if set forth at length herein.

77. Under New York law, the elements for defamation are that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff; (2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory *per se* or caused the plaintiff special harm. *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 280 (S.D.N.Y. 2016).

78. Generally, spoken defamatory words are slander; written defamatory words are libel. *Albert v. Loksen*, 239 F3d 256, 265 (2d Cir. 2001).

79. An employer is liable for the defamatory conduct of an employee under a *respondeat superior* theory if the employee, in committing the act complained of, was acting within the scope of his employment. *Buck v. Zwelling*, 707 N.Y.S.2d 281, 282 (N.Y. App. Div. 4th Dept. 2000)

80. Words constitute slander *per se* if it falsely imputes to the plaintiff criminal activity, *Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 272 (S.D.N.Y.1989), or incompetence in the performance of the plaintiff's trade, occupation, or profession, *Michael G. Kessler & Associates, Ltd. v. White*, 28 A.D.3d 724 (N.Y. App. Div. 2d Dept. 2006),

81. On or about September 9, 2017, at an RDC board meeting, Brennan confronted Mr. Doud in front of the board of directors and claimed that Mr. Doud was going to prison for an

illicit relationship with BelHealth, clearly implying that Mr. Doud had committed a crime.

82. Brennan further claimed that Mr. Doud was involved in a "kickback scheme" with BelHealth, the owner of Linden Care, which improperly provided Mr. Doud with financial benefits at the expense of RDC and caused RDC's recent legal issues with the DEA and DOJ.

83. On or about February 2018, Kinney stated to Don Catalano, the owner of Glen Cove Pharmacy, an RDC client, that Mr. Doud's failures as CEO was the reason the Company would not be paying patronage dividends to its members in 2018.

84. Kinney also asserted that Mr. Doud was responsible for RDC's recent legal issues with the DEA and DOJ.

85. The above-pled misconduct by Brennan and Kinney constitute the tort of defamation.

86. These statements made by Brennan and Kinney severely harmed Mr. Doud's personal and professional reputation and are patently false: (i) Mr. Doud is not responsible RDC's recent legal issues with the DEA and DOJ; (ii) Mr. Doud was not responsible for RDC's violations of the CSA from 2012 until 2014; (iii) Mr. Doud was never involved in a "kickback scheme" with BelHealth; (iv) any compensation that Mr. Doud received in relation to BelHealth was dictated by Mr. Doud's employment contract with RDC; (v) Mr. Doud is not responsible for RDC's alleged inability to pay patronage dividends to its members in 2018, if that occurs.

87. These defamatory statements by Brennan and Kinney were knowingly false when made and made to parties that possessed an ability to adversely affect Mr. Doud's livelihood—the RDC Board of Directors and RDC customers, such as Don Catalano.

88. Further, Brennan's and Kinney's defamatory statements constitute slander *per se*. They clearly and falsely impute criminal behavior and professional incompetence to Mr. Doud and lead the average person to form a negative opinion of Mr. Doud. In such a case, damages

resulting from Brennan's and Kinney's defamatory statements are presumed as a matter of law.

89. As Brennan and Kinney were acting within the scope of their employment at RDC while making these defamatory statements against Mr. Doud, under *respondeat superior*, RDC is also liable for their defamatory conduct.

90. As a result of this defamation by Brennan and Kinney, Mr. Doud has been damaged in an amount to be determined at trial together with other costs, interest and attorneys' fees.

## THIRD CAUSE OF ACTION

### Tortious Interference with Employment Agreement

***Against Defendant Brennan***

91. Plaintiff repeats and re-alleges paragraphs 1 - 90 as if set forth at length herein.

92. Under New York law, the elements of a tortious interference claim are: (1) that a valid contract exists; (2) that a "third party" had knowledge of the contract; (3) that the third party intentionally and improperly procured the breach of the contract; and (4) that the breach resulted in damage to the plaintiff. *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir.1996).

93. On March 11, 2014, Mr. Doud entered into the Employment Agreement with RDC for a term of five years commencing on April 1, 2014 and terminating on March 31, 2019.

94. Brennan had knowledge of Mr. Doud's Employment Agreement as he was RDC's Chief Operating Officer. Furthermore, at the start of the fourth year of Mr. Doud's Employment Agreement, Brennan replaced Mr. Doud as the CEO of RDC.

95. Brennan intentionally and wrongfully caused RDC to breach Mr. Doud's Employment Agreement as Brennan signed Mr. Doud's Termination Notice and acted with malice in effectuating the termination of Mr. Doud's employment.

96. Brennan's true motivation in terminating Mr. Doud was out of self-interest and a

desire to harm Mr. Doud.

97. Mr. Doud's Termination Notice explicitly and falsely alleges that Mr. Doud was in "receipt of financial benefit through RDC's relationship with BelHealth at the expense of RDC's other members," without further explanation. In sum and substance, this was the same defamatory statement that Brennan made to the RDC Board of Directors on or about September 9, 2017.

98. Brennan terminated Mr. Doud's employment at RDC in an effort to shift the responsibility to Mr. Doud in the face of the DOJ's intensifying criminal investigation into the Company.

99. Mr. Doud suffered harm as he will not receive the agreed upon compensation for the fifth year of the Employment Agreement of $500,000, long-term insurance benefits and other benefits as alleged herein.

100. As a result of this tortious interference of the Employment Agreement by Brennan, Mr. Doud has been damaged in an amount not less than $2,000,000, together with other costs, interest and attorneys' fees.

**WHEREFORE**, Mr. Doud's prayer for judgment and relief are as follows:

(a) An award of actual, compensatory and punitive damages from all Defendants, jointly and severally, for all damages Mr. Doud sustained as a result Defendants' conduct, in an amount to be determined at trial, including interest thereon;

(b) An award of reasonable attorney's fees and the costs of this action; and

(c) Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a jury on all issues so triable.

Dated: New York, New York
April 5, 2018

Respectfully submitted,

GOTTLIEB & JANEY LLP

By: ______________________
Derrelle M. Janey

Gottlieb & Janey LLP
Trinity Building
111 Broadway, Suite 701
New York, NY 10006
Tel.: (212) 566-7766
Fax: (212) 374-1506
Email: djaney@gottliebjaney.com

*Attorneys for Claimant
Laurence F. Doud III*